**UNITED STATES of America, Appellee,**

v.

**Harland G. "Skip" FITTERER, Appellant.**

**No. 82–2338.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1983.

Decided June 30, 1983.

Certiorari Denied Oct. 3, 1983.

See 104 S.Ct. 165.

Michael F. Fetsch, St. Paul, Minn., for appellant.

James M. Rosenbaum, U.S. Atty. by Thorwald Anderson, Jr., Asst. U.S. Atty., D. Minn., Minneapolis, Minn., Arlen Larson, Legal Intern, for appellee.

Before HEANEY, Circuit Judge, and FLOYD R. GIBSON and ROSENN,* Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

Harland Fitterer appeals his convictions on seven counts of mail fraud in violation of 18 U.S.C. § 1341 (1976), one count of transportation of property taken by fraud in violation of 18 U.S.C. § 2314 (1976), one count of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510 (1976), and one count of conspiracy in violation of 18 U.S.C. § 371 (1976). His convictions came after a jury trial. The district court sentenced Fitterer to concurrent four-year sentences on all counts except the obstruction of a criminal investigation count, for which he received a two-year consecutive sentence, and one of the mail fraud counts, for which he received a five-year suspended sentence. We affirm the judgment of the district court.[1]

## I. Facts

Fitterer's convictions stem from an insurance fraud scheme. The evidence at trial showed that Fitterer was the manager of the Minneapolis branch of Milbank Mutual

---

* The Honorable Max Rosenn, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

1. The Honorable Paul A. Magnuson, United States District Judge, District of Minnesota.

Insurance Company and had the authority to investigate, evaluate, and settle claims brought against the insurance company. Fitterer and two accomplices, Ronald Sterry and Jerry Peterson, developed a plan for filing fraudulent claims with the insurance company. In one of the schemes, Sterry insured a pickup truck and camper he did not own, and then reported the items as stolen. The insurance company paid more than $13,000 on the claim. In another fraud, Sterry reported that he had hit a Corvette, which was in fact owned by his accomplice Peterson, and filed a claim for damages in connection with the purported accident. The insurance company paid more than $6,000 on this claim. Fitterer was the insurance representative who signed all the checks in payment of these claims. A third scheme involved Peterson and another co-defendant, with the co-defendant fraudulently reporting that a boat was stolen. The insurance company paid more than $9,000 on this claim. A fourth fraud was perpetrated when another co-defendant made a claim for a home that was purportedly destroyed by fire; in fact it had been torn down before the fire supposedly occurred. The claim check was made out to Ronald Sterry's father-in-law, and it too was signed by Fitterer. The four schemes took place between August 1980 and August 1981.

Federal authorities began their investigation into the case in October 1981. Sometime before January 1, 1982, a federal grand jury began an investigation. In January, Fitterer asked a person who was being questioned by the investigators, Jerry McGraw, to tell investigators that McGraw had made an estimate on the house that the defendants claimed had burned down. Fitterer asked McGraw to "act hazy" about the house and its location. Also in January, federal authorities obtained help in the investigation from one of Fitterer's accomplices, Ronald Sterry. Sterry agreed to wear a tape recorder and a transmitter to a meeting with Fitterer and thereby helped obtain incriminating evidence. Sterry's meeting with Fitterer took place two weeks after Fitterer had appeared before the grand jury.

Fitterer and the other defendants were indicted in April. The mail fraud counts were based on the fraudulent schemes and the obstruction of a criminal investigation count was based on Fitterer telling McGraw to "act hazy" if investigators asked McGraw about the house that was supposedly burned down. Fitterer was tried in August and sentenced in October.

## II. Obstruction of a Criminal Investigation

Fitterer's first argument is that the jury was improperly instructed on the charge of obstructing a criminal investigation. 18 U.S.C. § 1510(a).[2] A person violates that section if he "willfully endeavors *by means of bribery, misrepresentation, intimidation, or force* or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator ...." (Emphasis added.) Fitterer argues that he can be convicted under § 1510(a) only if he used "bribery, misrepresentation, intimidation or force or threats thereof" to obstruct an investigation. Fitterer did not use any of the proscribed acts upon McGraw to try to induce him to mislead investigators. Fitterer objects to the instruction which allowed the jury to find a violation even though Fitterer did not use the specifically proscribed acts upon McGraw. The district court told the jury: "A misrepresentation also occurs whenever an individual induces or attempts to induce another person to make a material misrepresentation to a criminal investigator. In this instance, the

---

**2.** An amendment to § 1510 did not become effective until October 14, 1982, two months after Fitterer's trial. Victim and Witness Protection Act, Pub.L. No. 97–291 §§ 4(e), 9(a), 96 Stat. 1248; 18 U.S.C.A. § 1510 note (West Supp.1983). Therefore, the amendment has no effect on our analysis.

defendant need not make any misrepresentation himself." The issue is whether Fitterer can be convicted for a violation of § 1510(a) even if he did not make a misrepresentation himself.

Fitterer relies primarily on the language of the statute. Excising portions not at issue, the statute makes it a crime to "endeavor[ ] *by means of* ... misrepresentation ... to obstruct ... the communication of information ... by any person to a criminal investigator." (Emphasis added.) According to Fitterer, the statute allows a person to obstruct the communication of information as long as one does not do so by means of misrepresentation or one of the other proscribed methods.

■ We do not read the statute as narrowly as Fitterer. We think the statute can be fairly read to prohibit obstructions to the communication of information which are effectuated by means of misrepresentation, and is not limited to situations where the defendant used a misrepresentation to induce a third party to lie.

The legislative history shows that Congress intended to outlaw Fitterer's conduct. The House Judiciary Committee report shows that the main purpose of § 1510 is to protect potential witnesses from threats and intimidation by subjects of criminal investigations. H.R.Rep. No. 658, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Ad.News 1760, 1761–62. However, the committee report specifically dealt with the meaning of the term "misrepresentation." The report states:

> It is our intention that the actual procurement by a party of another party's misrepresentation or silence to a Federal investigator would be covered even though such procurement was not achieved by any misrepresentation. At the same time, it is also our intention that procurement of a witness' communication or silence to a Federal investigator by means of a misrepresentation on the part of the procurer is also covered under the act.

*Id.* at 1762. (Emphasis added.) *But see* Additional Views of Basil L. Whitener and William L. Hungate, *id.* at 1765. ("The misrepresentation of facts by individuals contacted by law enforcement officers is an entirely different matter from bribery, intimidation, or the use of force to obstruct criminal investigations.") Our view of the meaning of the word "misrepresentation" in § 1510 is shared by the only other federal appeals court to have considered the issue. *United States v. St. Clair,* 552 F.2d 57, 58–59 (2d Cir.), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).

■ We believe that resort to the legislative history to clarify the meaning of § 1510 is appropriate. We are aware of the general rule that a penal statute must be strictly construed so that no one can be subjected to a penalty unless a fair warning has been given in words which plainly impose the penalty. *United States v. Campos-Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971); W. LaFave and A. Scott, Criminal Law § 10, at 72 (1972). Likewise, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). However, the rule of strict construction of penal statutes cannot provide a substitute for the legislative history. *United States v. Standard Oil Co.,* 384 U.S. 224, 225, 86 S.Ct. 1427, 1427, 16 L.Ed.2d 492 (1966). The rule does not require that a statute be given the narrowest meaning. It is sufficient if words are given their fair meaning in accord with the evident intent of Congress. *United States v. Cook,* 384 U.S. 257, 262, 86 S.Ct. 1412, 1414, 16 L.Ed.2d 516 (1966); *United States v. Bass,* 404 U.S. 336, 351, 92 S.Ct. 515, 524, 30 L.Ed.2d 488 (1971). Furthermore, the need for strict construction is not as great when the conduct is morally bad. W. LaFave and A. Scott, Criminal Law § 10, at 73. When

the conduct is morally bad, the defendant is more likely to have fair warning of what is prescribed; no one would be surprised to learn that soliciting misrepresentations by a potential witness is illegal. *St. Clair,* 552 F.2d at 59.

Section 1510 can, on its face, be fairly read to prohibit asking someone to make a misrepresentation to a criminal investigator, and the legislative history makes the Congressional intent completely clear on this point. Therefore we share the view of the Second Circuit that § 1510 prohibits a procurement of a third party's misrepresentation to a criminal investigator.

### III. *Other Crimes Evidence*

Fitterer's second argument is that he was prejudiced by testimony about an insurance fraud scheme of his which was not mentioned in the indictment. During the government's direct examination of one of the co-indictees, Jerry Peterson, the prosecutor asked when Peterson and Fitterer were first involved in a fraudulent insurance claim. Peterson answered that in 1979 or 1980 he and Fitterer split insurance money after falsely reporting that a pickup truck was stolen. When the prosecutor started asking about a second scheme, defense counsel objected. After a conference in chambers the district court observed that the objection was not timely, stated that it would have found the testimony admissible as evidence of other crimes to show motive, intent, etc., under Fed.R.Evid. 404(b) and that the probative value of the testimony was not outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. The court therefore denied Fitterer's motion for a mistrial. Nevertheless, the court was willing to grant a limiting instruction to the jury to disregard the question and answer.

■ We will not reverse Fitterer's conviction on this issue because the testimony to which Fitterer objects was admissible. The evidence of the earlier insurance fraud scheme was relevant to show Fitterer's intent under Fed.R.Evid. 404(b). The probative value is high because the testimony came from an accomplice and it outweighed any unfair prejudice. We have allowed the admission of testimony of other crimes in similar circumstances. We stated in *United States v. Calvert,* 523 F.2d 895, 908 (8th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976): "We have previously held in mail fraud cases that evidence of other offenses by the defendant is admissible to show criminal intent where the other offenses are similar to and not too remote in time from the offense charged." Likewise, in *United States v. Legendre,* 657 F.2d 238, 240, 242 (8th Cir.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981), we held that the government could properly ask the witness how many previous drug deals he had made with the defendant.[3]

■ Fitterer appears also to be arguing that even if the testimony was admissible, there was prosecutorial misconduct in failing to give notice to defense counsel of the prosecutor's intent to introduce other crimes evidence. Fitterer relies on *United States v. Baum,* 482 F.2d 1325 (2nd Cir. 1973), which Fitterer argues supports the proposition that introduction of other crimes evidence without notice to the court or defense counsel deprives the defendant of a fair trial. Fitterer misreads *Baum.* The misconduct the Second Circuit found in *Baum* was the refusal of the prosecutor to even *identify* a prospective witness who testified about prior crimes. *Id.* at 1331. Furthermore, the facts of this case do not support Fitterer's argument. At a pretrial conference the prosecutor told the court and defense counsel that Peterson would be a witness and he might testify about the

**3.** When a court admits evidence of other crimes, it should give an instruction, if requested, that the evidence should be considered for a limited purpose other than proving the character of the accused. In the instant case there was not a timely objection, but once an objection was made the district court instructed the jury to disregard the evidence. The court gave a more restrictive instruction than would ordinarily be required for Rule 404(b) evidence.

insurance fraud with the pickup truck that took place in 1979 or 1980. Therefore, the other crimes testimony provides no basis for a reversal.

### IV. Right to Counsel

Fitterer's last argument is that the government interfered with his right to counsel by having one of Fitterer's accomplices, Ronald Sterry, wired before a meeting with Fitterer. Fitterer argues this violated his right to counsel and also violated the Minnesota Code of Professional Responsibility because he had retained counsel, in connection with his grand jury appearance, before the conversation with Sterry occurred. He asks for reversal of his conviction and dismissal of the indictment based on the alleged violations.

■ At the time of the conversation with Sterry, Fitterer had not been indicted nor formally charged in any other way. He was not in the custody of authorities at the time of his conversation with Sterry. Fitterer clearly did not have a sixth amendment right to counsel [4] because the sixth amendment right to counsel does not attach until adversarial judicial proceedings have been initiated. *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972); *United States v. Surridge,* 687 F.2d 250, 253 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982). Likewise, Fitterer did not have a fifth amendment right to counsel. The Supreme Court has recognized that a person has a right to counsel during custodial interrogation as part of his fifth amendment right not to be "compelled ... to be a witness against himself." *Miranda v. Arizona,* 384 U.S. 436, 467–70, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona,* 451 U.S. 477, 481–82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). Fitterer was not in custody at the time of the conversation with Sterry and therefore the

fifth amendment right to counsel is not implicated.

Fitterer also argues that by having Sterry record and transmit the conversation, the prosecutors violated Disciplinary Rule 7–104 of the Minnesota Code of Professional Responsibility which reads:

#### Communicating With One of Adverse Interest

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Fitterer argues that because he had retained counsel for the grand jury investigation the prosecutor could communicate with him only through his attorney, and not through Sterry.

■ We reject Fitterer's contention. Under his view, once the subject of an investigation retains counsel, investigators could no longer direct informants to gather more evidence. We do not believe that DR 7–104(A)(1) of the Code of Professional Responsibility was intended to stymie undercover investigations when the subject retains counsel. Our view is shared by all three circuits which have considered the effect of DR 7–104(A)(1) in situations like Fitterer's. *United States v. Vasquez,* 675 F.2d 16, 17 (2nd Cir.1982); *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981); *United States v. Lemonakis,* 485 F.2d 941, 955–56 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974). We find no ethical violation on the part of the prosecutors.

Having considered the issues raised by Fitterer on his appeal, we affirm the judgment of the district court.

---

**4.** The sixth amendment reads in pertinent part: "[T]he accused shall enjoy the right ... to have the Assistance of Counsel for his defence."